DECISION ON OBJECTIONS TO THE MAGISTRATE'S DECISION
{¶ 1} Relator, Acusport Corporation, has filed this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order granting R.C. 4123.56(B) wage-loss compensation to respondent-claimant, Beth Ann R. Orahood, and to enter an order denying said compensation.
 {¶ 2} This matter was referred to a court-appointed magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, and recommended that this court deny relator's request for a writ of mandamus. (Attached as Appendix A.) Relator has filed objections to the magistrate's decision.
 {¶ 3} Most of the arguments in relator's objections merely reiterate its prior arguments and present its own interpretation of the evidence; however, Acusport does raise several objections directed specifically at the magistrate's analysis of whether wage-loss compensation was appropriately awarded during claimant's employment at Jo-Ann Fabrics, and we will address each specific objection in turn. Acusport first asserts that the magistrate ignored the fact that claimant's vocational rehabilitation file was terminated due to her own non-compliance and "failure to conduct a good[-]faith job search." We disagree. The magistrate quoted the portion of the commission's order in which it specifically recognized that claimant's rehabilitation file was closed due to a lack of a sufficient number of job contacts per week. The commission then evaluated all of the circumstances and found they, in total, demonstrated a good-faith job search. Thus, neither the magistrate nor the commission ignored this fact. Further, claimant's rehabilitation file was not closed for "failure to conduct a good[-]faith job search." Rather, the file was closed because she failed to make a sufficient number of job contacts per week. On its face, this reason takes into account only the shear quantity of contacts and does not take into account other factors and circumstances that the commission may, and did, use to determine whether the search was made in "good faith." Therefore, this argument is without merit.
 {¶ 4} Acusport also argues that the magistrate's decision sets dangerous precedent, in that the magistrate concurred with that portion of the commission's order in which it stated that the best evidence of a good-faith job search is the obtaining and accepting of a qualified position. We disagree. First, the commission stated that this was a "general proposition." Second, the commission did not state that a good-faith job search was evidenced by the "mere" finding of any employment, as Acusport claims; rather, the commission stated the acceptance of a "qualified" position was the best evidence of a good-faith search, which presumably means a position that is consistent with a claimant's qualifications. Here, in finding that claimant's job search was made in good faith, the commission noted claimant had a limited education, lifting restrictions, and a lack of special skills or training, and it clearly considered such factors. Therefore, the commission did not rely upon claimant merely finding any job regardless of her employment history or skill level. It is clear from the whole of the commission's decision that it found several factors pertinent to whether claimant demonstrated a good-faith job search. Thus, we find Acusport's argument in this respect to be without merit.
 {¶ 5} Acusport also argues that the magistrate erred in finding that the classified advertisements presented by Acusport from claimant's local newspaper failed to demonstrate claimant did not conduct a good-faith job search; however, Acusport admits that the classified ads it presented were not from the period during claimant's actual job search prior to her employment at Jo-Ann Fabrics. Thus, regardless of Acusport's arguments regarding the magistrate's and commission's consideration of such, the evidentiary value to this specific case is dubious at best.
 {¶ 6} Acusport's remaining objections are spent arguing that there was no evidence that claimant conducted a good-faith job search prior to gaining employment at Jo-Ann Fabrics; however, the magistrate fully analyzed this evidence and considered the commission's interpretation and weighing of such, and we concur with his analysis finding claimant conducted a good-faith job search.
 {¶ 7} After an examination of the magistrate's decision, an independent review of the record pursuant to Civ.R. 53, and due consideration of relator's objections, we overrule the objections and find that the magistrate sufficiently discussed and determined the issues raised. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it, and deny relator's request for a writ of mandamus.
Objections overruled; writ denied.
Klatt and McCormac, JJ., concur.
McCormac, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), ArticleIV, Ohio Constitution.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. Acusport Corporation, : Relator, : v. : No. 03AP-875 Beth Ann R. Orahood and : (REGULAR CALENDAR) The Industrial Commission of Ohio, : Respondents. :
 MAGISTRATE'S DECISION Rendered on March 18, 2004 Pickrel, Schaeffer Ebeling Co., L.P.A., David C. Korte,Michelle D. Bach and Salvatore A. Gilene, for relator.
Cannizzaro, Fraser, Bridges Jillisky, and Nancy L.Jillisky, for respondent Beth Ann R. Orahood.
Jim Petro, Attorney General, and Thomas L. Reitz, for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 8} In this original action, relator, Acusport Corporation, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order awarding R.C. 4123.56(B) wage loss compensation to respondent Beth Ann Orahood, and to enter an order denying said compensation.
Findings of Fact:
 {¶ 9} 1. On September 6, 2001, Beth Ann Orahood ("claimant") sustained an industrial injury while employed at a warehouse operated by Acusport, a state-fund employer. Acusport's warehouse is located in the Bellefontaine, Ohio area. The industrial claim is allowed for: "sprain of neck," and is assigned claim number 01-443107.
 {¶ 10} 2. On the date of her injury, claimant was 21 years old. She had a high school degree and no special vocational education. She had worked at Acusport's warehouse since April 1999 and was earning $9.55 per hour at the time of her injury.
 {¶ 11} 3. Claimant's job at Acusport was that of a "Picker Packer." A "picker" travels to the correct bin after receiving the order, pulls the item and places it onto a motorized cart. While picking, the worker must climb a six-foot ladder attached to the cart to reach some items. The items pulled average 30 pounds but some weigh up to 65 pounds. A "packer" obtains the item from the cart, scans it and then packs the order into a box. A "packer" then seals the box and places it onto a conveyor by lifting or pushing.
 {¶ 12} 4. Acusport elected to continue paying wages to claimant in lieu of temporary total disability ("TTD") compensation. Wage continuation payments to claimant ceased effective February 18, 2002. In the meantime, in January 2002, claimant was referred for vocational rehabilitation by the Ohio Bureau of Workers' Compensation ("bureau").
 {¶ 13} 5. Initially, the rehabilitation plan provided for claimant to participate in a gradual return-to-work with onsite physical therapy. Claimant completed the program in late March 2002. Although she was then working an eight-hour day at Acusport, she was restricted to lifting under 25 pounds by her physician of record who certified that the lifting restriction was permanent.
 {¶ 14} 6. On April 26, 2002, Acusport terminated claimant's employment on grounds that it could not accommodate the permanent lifting restriction.
 {¶ 15} 7. Following her termination from Acusport, the rehabilitation plan was amended to include a job search program which began in late April 2002.
 {¶ 16} 8. The rehabilitation case manager assigned to claimant's case authored three written reports of record. In a report apparently authored in late May 2002, the case manager wrote:
* * * During job seeking skills training, Beth was able to identify positions in which she would like to apply for. It was decided that she would like to work as a Receptionist in a Vet's office or medical office. It was also decided to look into positions such a[s] Bank Teller, Customer Services and Sales Clerk. This case manager also met with Beth on 5/6/02. At this time, Beth went to the Library and an Internet search was completed. She was taught how to identify positions on the internet and how to use the computers to write cover letters. She opened an email account for responses from employers. This case manager met with her again on the 17th to provide job leads and support with her job search efforts. Beth contacts this case manager on a daily basis to provide updates on her activities and to assist with structuring her job search. She has communicated a lot of frustration regarding finding a job. She had trouble getting her 15 contacts the first week of job search. She appears to need a lot of support to maintain a positive attitude regarding her ability to seek and obtain employment. This case man[a]ger will continue to meet with her weekly face to face and provide daily contact for support and problem solving.
 {¶ 17} 9. In a report apparently authored in late July or early August 2002, claimant's case manager wrote:
Beth continues in job search and continues to have trouble securing job leads. This case manager continues to supply some leads but the labor market in her area is poor. She has had interviews with a hotel, a check cashing company, Walmart and a video store. She has applied for several positions with Mary Rutan Hospital. Walmart called her back for a 2nd interview and wanted to offer her a part-time position but would not give her consistent hours so she could secure another part[-]time job. She had to be available for scheduling from morning to night. She explained to them that she would take the position if they would provide her with full[-]time work. The video store also contacted her for a 2nd interview but decided to bring employees from other stores in to work initially. They told Beth that [they] wanted to hire her within the next couple of months.
Beth has had car trouble this review period and has had to depend on others to take her to employers. This case manager met with Beth on 5/24 and 6/19 for job club activity. During these times, she was provided several leads. Many of the leads required her to mail out resumes. She was provided leads to two group homes in her area who needed someone to assist with individuals with MR/DD. She has not received any response back from these employers. She also sent a resume to a Dentist office for receptionist. She has expanded her search to surrounding areas but this is difficult for her due to transportation. She talked about getting another car with her parent's help and searching in Columbus for jobs. She stated she would be willing to relocate. Beth's job search plan will end on August 10th. This case manager is concerned that she will not have found employment by that time.
 {¶ 18} 10. On August 24, 2002, the case manager issued a vocational rehabilitation closure report stating:
* * * It was determined on 4/23/02 that AcuSport could not accommodate her permanent restrictions. Her plan was then revised for JSST and job search assistance. She began her JSST the week of 4/29[/]02. At that time, Beth was taken to her area library and shown resources to aid in her job search. This case manager also opened an e-mail account on Yahoo.com and provided her with resources on the Internet to aid in her job search. She did not use these resources until the 11th week of her job search. She was also provided with a list of all Hotels within a 50 mile radius of her home in which she could seek employment as a Front Desk Clerk. She was also provided with all veterinary offices that she could call regarding a Receptionist position. She began her job search on 5/4/02. This case manager met with her at her home on a few occasions during her job search. Ms. Orahood used this time not to discuss her job search but attempted to focus on personal issues in her life. Beth was to maintain contact with case manager every other day. She usually was very good about making contact. Beth communicated problems with transportation throughout her job search. She also com-municated a lack of available employers in her general area. When questioned regarding following up on the list of employers provided initially she stated she had not called them. She was also encouraged to seek employment outside of her town into surrounding areas. She discussed the possibility of moving to Columbus in order to seek employ-ment but did not investigate this further. She did secure interviews with a check cashing company, Walmart, Mary Rutan Hospital, video store, a hotel and a golf course. Walmart offered her a part-time position but would not commit hours that she would work. She was to be available anytime, which made it impossible to secure another part-time position. One employer advertised a sales clerk at a dry cleaner weekly throughout most of her job search. Beth was directed for 5 weeks to visit this employer and apply for the position. Her job search forms did not reflect that employer until 8/8/02. Beth communicate[d] on 8/15/02 that she was offered a position at Tree Link Gulf [sic] Course. She was to find out the following Monday what her start date was. She contacted this case manager the following week stating she was to go in the hospital for a bowel impaction. She called a few days later and when asked about the position she stated they hired someone else. Beth has continued to maintain contact although her plan ended. She has not secured employment. She is reporting increased pain in her neck and back.
This case manager discussed with VocWorks' Regional Manager and BWC Rehab Consultant about continuing Beth's job search beyond the allowed 13 weeks. It was com-municated that Beth had not made her required number of contacts consistently throughout the 13 weeks. She did not have a car, which would make it impossible to continue her job search. This case manager was directed to close her file.
Please note: on 8/23/02 Ms. Orahood contacted the cm [case manager] and stated she has been hired by JoAnn Fabric in Bellefontaine, earning $6.00 per hour. She is a manager and will work 30 hours per week. She will begin work on 8/25/02. She does not have benefits.
 {¶ 19} 11. Claimant filed an application for wage loss compensation. In her application, claimant sought so-called working wage loss compensation beginning August 23, 2002, on or about the date she began employment at Jo-Ann Fabrics.
 {¶ 20} 12. In support of her wage loss application, claimant submitted a record of job search contacts on a form provided by the bureau. The record lists a total of 15 contacts during June and July 2002. The record indicates that claimant had an interview at Wal-Mart on June 26, 2002 for a cashier position.
 {¶ 21} 13. In further support of her wage loss application, claimant submitted two pay stubs from Jo-Ann Fabrics. The pay stubs show that claimant's rate of pay was $6 per hour. Claimant worked 35 hours during the two-week period from August 25, 2002 through September 7, 2002. She worked only 15 hours for the two-week period from September 8, 2002 through September 21, 2002. No other pay stubs were submitted for Jo-Ann Fabrics.
 {¶ 22} 14. On November 27, 2002, the bureau referred the wage loss application to the commission for adjudication.
 {¶ 23} 15. In further support of her wage loss application, claimant filed on December 19, 2002, five pay stubs from Wal-Mart. Each Wal-Mart pay stub covers a two-week pay period. Claimant's regular rate of pay for the ten-week period was $6.65 per hour. Claimant generally worked 80 regular hours during each bi-weekly period. During the pay period October 19, 2002 through November 1, 2002, claimant worked 17.28 hours of overtime at $9.97 per hour for a total overtime wage of $172.37 ($9.97 x 17.28 = 172.37). During each of the other four bi-weekly pay periods, claimant always worked some overtime — from two to six hours at $9.97 per hour. Claimant also earned a Sunday premium of $10 during the pay periods.
 {¶ 24} 16. In further support of her wage loss application, claimant submitted two additional pay stubs from Wal-Mart. These two Wal-Mart pay stubs show that, by December 2002, claimant's regular rate of pay had increased to $6.93.
 {¶ 25} 17. In further support of her wage loss application, claimant submitted a medical report from Dr. Bouchard on a form provided by the bureau for wage loss applications. The report is dated September 4, 2002. On the report, Dr. Bouchard indicates that claimant is permanently restricted to lifting no more than 25 pounds occasionally. She is also restricted from lifting at or above the shoulder level.
 {¶ 26} 18. On January 10, 2003, a hearing was held before a district hearing officer ("DHO") on the wage loss application. Claimant did not testify and the hearing was not recorded. At the hearing, Acusport submitted a letter from the store manager at Jo-Ann Fabrics stating that claimant had been employed part-time and had been fired for "attendance reasons — constantly late."
 {¶ 27} 19. Following the January 10, 2003 hearing, the DHO issued an order awarding wage loss compensation from August 23, 2002 to December 27, 2002, and to continue upon submission of proof of wage loss.
 {¶ 28} 20. Acusport administratively appealed the DHO's order of January 10, 2003.
 {¶ 29} 21. Acusport's administrative appeal was heard by a staff hearing officer ("SHO") on February 25, 2003. Claimant testified at the hearing which was recorded and transcribed for the record.
 {¶ 30} 22. At the February 25, 2003 hearing, Acusport submitted classified advertisements from the Bellefontaine Examiner published February 7, 12, 14 and 15, of 2003. At the February 25, 2003 hearing, under cross-examination by Acusport, claimant testified that she had begun searching for other employment while working at Wal-Mart about two and one-half weeks before the hearing. She in effect admitted that she had not searched for other employment while working at Wal-Mart until just before the hearing.
 {¶ 31} 23. During the hearing, the following exchange occurred between the hearing officer and the claimant:
HEARING OFFICER * * *: And I would ask one other question.
When you were looking for a job, about how many hours a week did you spend looking, including all of your activities, whether it be, you know, searching the newspaper, going — if you did it on the Internet, OBS, any of those types of activities.
[Claimant]: Probably, like, six hours a day, because Denise O'Connor, which was the lady that was with me that helped me do that. My biggest problem with that was you had to have 15 a day. If you would understand, that is hard to get 15 a day in a small town.
HEARING OFFICER * * *: I understand
[Claimant's counsel]: Thank you. Just to clear up the lingering issue on her car, her car.
HEARING OFFICER * * *: The one that originally was —
[Claimant]: It was my old one, my Hyundai Elantra, and then my parents have paid the payments and just now paid it off for my Dodge Neon.
[Claimant's counsel]: In any event, she was without her transportation and couldn't afford to fix it.
[Hearing Officer]: I've got you.
 {¶ 32} 24. Following the February 25, 2003 hearing, the SHO issued an order denying wage loss compensation from August 23, 2002 through October 3, 2002 (the period of employment at Jo-Ann Fabrics) but granting wage loss compensation beginning October 5, 2002, when claimant began her employment at Wal-Mart.
 {¶ 33} 25. Acusport administratively appealed the SHO's order of February 25, 2003, to the three-member commission. The commission ordered that the discretionary appeal be heard and assigned the matter to a commission deputy.
 {¶ 34} 26. Following an April 23, 2003 hearing before a commission deputy, the deputy issued an order approved by the commission. The April 23, 2003 hearing was not recorded. The commission's order of April 23, 2003 states:
It is the order of the Deputy that the order of the Staff Hearing Officer, dated 02/25/2003, is vacated.
It is the order of the Deputy that the request for working wage loss is granted for payment from 08/23/2002 through 09/21/2002, subject to extrapolation; to be paid from 09/22/2002 through 10/04/2002 upon submission of wage statements, also subject to extrapolation; granted for payment from 10/05/2002 through 03/04/2003; and to be paid from 03/05/2003 and continuing (not to exceed the statutory maximum of 200 weeks or unless amended by future orders) upon submission of supporting medical evidence as required by O.A.C. 4125-1-01(C)(3) and wage statements document-ing a continued wage loss.
The Deputy finds the following relevant facts applicable: the injured worker was initially employed as a picker/packer, was injured while she was lifting a 60 pound box and her claim was allowed for a sprain of the neck. After therapy and other treatment, she returned to light duty trial work (beginning at 2 hours per day and increasing over time), restricted to lifting under 25 pounds per Drs. Watkins-Campbell and McCloud, with the instant employer on 02/18/2002. By 04/12/2002, she had returned to an 8-hour workday. However, she was terminated on April 26, 2002, when her physician, Dr. Watkins-Campbell, indicated that the restrictions involved were permanent. The injured worker then entered a vocational job search program resulting in limited success due to several problems, both unrelated and related to this claim (transportation difficulties, other medical conditions, lack of available employers in her area, frustration with overall situation, etc.). On 08/24/2002, the injured worker's rehabilita-tion file was closed due to a lack of a sufficient number of job contacts per week. At the same time, the injured worker was able to secure part-time employment with Jo Ann Fabrics beginning 08/25/2002 consisting of 10-20 hours per week at $6.00 per hour without benefits per a 12/27/2002 question-naire completed by the store manager and the 2 submitted pay stubs covering the period from 08/25/2002 through 09/21/2002. The injured worker has not submitted any additional job search records during her employment in this position. She was terminated by 10/13/2002 due to attendance problems per the 12/27/2002 questionnaire referenced above (the injured worker testified that she was still without personal transportation at this time). The Deputy finds that the termination must have occurred even sooner as the injured worker obtained a new full-time position of employment with Wal-Mart, which began on 10/05/2002. This position [is] found to be within the injured worker's medical restrictions. Furthermore, while the position initially paid $6.65 per hour, she is currently earning $6.93 per hour and the position includes health insurance, 401(K) participation, profit sharing and vacation/sick leave benefits. The injured worker currently has submitted to the file wage information through 03/21/2003. Finally, the injured worker testified that while currently working full-time, she has for the past 2 to 3 weeks spent additional time seeking greater payment employment, although she has not submitted any written evidence of this fact.
The employer asserts that if the injured worker's initial job search was not sufficient, then her obtaining employment with Wal-Mart also would not be sufficient as it could not "magically" transform an unacceptable effort into an acceptable one. Furthermore, the employer also asserts that the injured worker must seek and obtain "comparably paying work" in which the pay is either equal to or greater than her previous level of wages (i.e. average weekly wage in the former position of employment). They also insist that the injured worker is required to continue to seek comparably paying work regardless of the number of hours worked per week. Finally, the employer asserts numerous facts which they insist supports the idea that the injured worker has not met her burden of demonstrating a good faith effort in her job seeking actions.
The Deputy rejects these arguments in the awarding of working wage loss. Initially, the injured worker has only requested WORKING wage loss. Although the Deputy agrees that the injured worker has not documented the claim file with evidence of a good faith job search, neither has she requested any non-working benefits. Therefore, none is ruled on or awarded. However, the Deputy finds, as a general proposition, that the best evidence of a good faith job search is the obtaining and acceptance of a qualified position. Here, the injured worker started part-time employment the day after her rehabilitation file was closed (during a period when she did not have personal transportation) and furthermore, began full-time employment even before she was officially term-inated from the part-time position. Additionally, the full-time position produced greater wages (due to both the hourly rate as well as the number of hours worked) and provided her with numerous additional benefits in addition to the hourly wage.
The second argument is also rejected as, by the definition, if the injured worker were to earn wages equal to or greater than her average weekly wage then she would incur no wage loss and no compensation would be payable. Furthermore, while the injured worker is required, pursuant to O.A.C. 4125-1-01(D)(1)(c), to seek to eliminate the wage loss, several factors are enumerated to consider in analyzing whether the injured worker is providing a good faith effort, including: the injured worker's prior experience, the quantity and quality of the contacts, the number of hours spent working, refusal to accept assistance, labor market and economic status conditions, and the injured worker's physical capabilities. Overall, case law has dictated a totality of the circumstances test be applied in these situations. Here, the Deputy finds that the injured worker has satisfied the requirements of the rule as she has little experience (age 23, high school graduate without additional training), has progressed from part-time work without benefits to full-time work with benefits, has already received one pay raise, worked with assistance when available and is living in a small to medium size community.
Next, the employer asserts the injured worker is required to seek additional employment opportunities while being employed. The Deputy agrees with this position for the period the injured worker was employed part-time with Jo Ann Fabrics. Therefore, for working wage loss compensation from 08/23/2002 through 10/04/2002, as applicable, and absent any job search records, the Deputy orders that the injured worker's wages be artificially extrapolated to full-time wages and then calculated for wage loss compensation over this period of time. However, as the injured worker's position with Wal-Mart is a full-time position (with even some additional overtime included), the Deputy finds that no additional job search is required in order for the injured worker to be wage loss eligible. Any additional job search is permissible (as in the injured worker's own best interest to seek and obtain higher paying and more prestigious employment), but not required. Therefore, benefits payable beginning 10/05/2002 and continuing are ordered paid at the normal calculation.
Finally, the employer's assertion that the other facts cited in their brief are indicative of a lack of a good faith effort is not found to be persuasive. The Deputy notes the quickness that the injured worker was able to obtain employment (twice) under less than perfect circumstances. Furthermore, her consistent employment (per the pay statements from Wal-Mart) and pay increase demonstrate her good faith and the fact that the change of employment is found to be caused by the injury and is not simply a lift-style [sic] choice. Overall, the Deputy finds that the injured worker has complied with the requirements of O.A.C. 4125-1-01 and the relevant case law and that she is entitled to wage loss compensation as indicated in this decision.
The Deputy, therefore, awards wage loss compensation as indicated herein, with the finding that the medical certification of Dr. Bouchard, dated 09/04/2002, extends, by rule, only until 03/04/2003. Therefore, any additional wage loss com-pensation beginning 03/05/2003 and continuing will require additional medical certification as well as continued wage statements.
 {¶ 35} 27. On September 8, 2003, relator, Acusport Corporation, filed this mandamus action.
Conclusions of Law:
 {¶ 36} Two time periods of the wage loss claim are at issue: (1) the employment at Jo-Ann Fabrics from August 25, 2002 to sometime in late September or early October 2002, and (2) the employment at Wal-Mart beginning October 5, 2002.
 {¶ 37} With respect to the employment at Jo-Ann Fabrics, two issues are presented: (1) whether claimant failed to conduct a good-faith job search prior to obtaining employment at Jo-Ann Fabrics, and (2) whether the commission deputy erred in ordering wage loss "subject to extrapolation."
 {¶ 38} With respect to the employment at Wal-Mart, the issue is whether claimant was required to search for comparably paying work when she began her employment at Wal-Mart.
 {¶ 39} With respect to the employment at Jo-Ann Fabrics, the magistrate finds: (1) claimant did not fail to conduct a good-faith job search prior to obtaining employment, and (2) the commission deputy did not err in ordering wage loss "subject to extrapolation" as that term is clarified herein. With respect to the Wal-Mart employment, the magistrate finds that claimant was not required to search for comparably paying work when she began her employment there.
 {¶ 40} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 41} Ohio Adm. Code 4125-1-01 sets forth the commission's rules with respect to wage loss applications. Ohio Adm. Code4125-1-01(A) sets forth several definitions.
 {¶ 42} Ohio Adm. Code 4125-1-01(A)(7) states:
"Suitable employment" means work which is within the claimant's physical capabilities, and which may be performed by the claimant subject to all physical, psychiatric, mental, and vocational limitations to which the claimant is subject at the time of the injury which resulted in the allowed conditions in the claim or, in occupational disease claims, on the date of the disability which resulted from the allowed conditions in the claim.
 {¶ 43} Ohio Adm. Code 4125-1-01(A)(8) states:
"Comparably paying work" means suitable employment in which the claimant's weekly rate of pay is equal to or greater than the average weekly wage received by the claimant in his or her former position of employment.
 {¶ 44} Ohio Adm. Code 4125-1-01(D) states in part:
In considering a claimant's eligibility for compensation for wage loss, the adjudicator shall give consideration to, and base the determinations on, evidence in the file, or presented at hearing, relating to:
(1) The claimant's search for suitable employment.
* * *
(c) A good faith effort to search for suitable employment which is comparably paying work is required of those seeking non-working wage loss and of those seeking working-wage loss who have not returned to suitable employment which is comparably paying work * * *. A good faith effort necessitates the claimant's consistent, sincere, and best attempts to obtain suitable employment that will eliminate the wage loss. In evaluating whether the claimant has made a good faith effort, attention will be given to the evidence regarding all relevant factors including, but not limited to:
(i) The claimant's skills, prior employment history, and educational background;
(ii) The number, quality (e.g., in-person, telephone, mail, with resume), and regularity of contacts made by the claimant with prospective employers, public and private employment services;
* * *
(iv) Except as provided in paragraph (D)(1)(c)(v) of this rule, for a claimant seeking any amount of working wage loss, the amount of time devoted to making prospective employer contacts during the period for which working wage loss is sought as well as the number of hours spent working; while the adjudicator shall consider this comparison in reaching a determination of whether there was a good faith job search, the fact that the sum of the hours the claimant spent searching for work and working is not as many hours as were worked in the former position of employment shall not necessarily be dispositive[.]
 {¶ 45} Ohio Adm. Code 4125-1-01(F) is captioned "Computation of wage loss." Ohio Adm. Code 4125-1-01(F)(3)(b) states:
(b) If the adjudicator finds that the claimant has returned to employment but has voluntarily limited the number of hours which he is working, and that the claimant is nonetheless entitled to wage loss compensation, the adjudicator, for each week of wage loss compensation requested by the claimant, shall determine: the number of hours worked by the claimant in the employment position to which he has returned, and the hourly wage earned by the claimant in the employment position to which he has returned. In such a case, the adjudicator shall order wage loss compensation to be paid at a rate of sixty-six and two-thirds per cent of the difference between:
(i) The weekly wage the claimant would have earned in the former position of employment if the claimant had worked only the number of hours the claimant actually worked each week in the employment position to which the claimant returned; and
(ii) The weekly amount the claimant actually earned in the employment position to which he returned.
(iii) In situations where the adjudicator finds that the claimant has returned to employment and has voluntarily limited the number of hours which he is working, and that the claimant is nonetheless entitled to wage loss compensation, but that paragraphs (F)(3)(b)(i) and (F)(3)(b)(ii) of this rule are not directly applicable, the adjudicator shall have the discretion to establish a number of hours to be utilized in the calculation of wage loss compensation that is not unreasonable, un-conscionable or arbitrary.
 {¶ 46} With respect to employment at Jo-Ann Fabrics, the first issue, as previously noted, is whether claimant failed to conduct a good-faith job search prior to obtaining employment there. It should be noted that Acusport has focused this issue on claimant's conduct prior to her obtaining employment at Jo-Ann Fabrics.
 {¶ 47} Claimant's employment at Jo-Ann Fabrics was part-time at a rate of pay of $6 per hour. This contrasts with her employment at Acusport which was full time and at a rate of pay of $9.55 per hour. Obviously, the employment at Jo-Ann Fabrics was not work comparable in pay to the former position of employment.
 {¶ 48} Claimant's employment at Jo-Ann Fabrics began August 25, 2002. During the approximately four months prior to this employment, claimant was involved in a bureau sponsored job search program that began shortly after Acusport terminated her employment on April 26, 2002. We know a great deal about claimant's job search efforts from the three written reports of claimant's rehabilitation case manager.
 {¶ 49} Acusport's contention that claimant failed to conduct a good-faith job search prior to obtaining employment at Jo-Ann Fabrics is premised upon the unspoken assumption that the commission and this court are required to view the case manager reports in a light most favorable to Acusport's contention. Acusport's assumption is incorrect. It is the commission that weighs the evidence including the case manager reports. Moreover, this court will not reweigh that evidence for the commission.
 {¶ 50} Here, Acusport emphasizes some items from the case manager reports in order to portray the view that claimant failed to conduct a good-faith job search. In its brief, Acusport argues:
The Vocational Rehabilitation Closure Report also illustrates Orahood's effort to conduct a good faith job search. She did not use her email account or Internet access until the eleventh week of her job search. * * * When Orahood met with her case manager to discuss her job search, Orahood focused on personal issues in her life. * * * Orahood was provided a list of potential employers by her Vocational Rehabilitation case manager, but she never contacted those employers. * * * She was directed for five weeks to contact an employer about a sales clerk position at a dry cleaner, but she did not make contact until August 8, 2002. * * * Further, Orahood's voca-tional rehabilitation file was closed because she did not make her required number of contacts consistently throughout her participation in the program. * * *
Based on this information, Orahood was provided a variety of employment leads and resources, all of which she either ignored or neglected. Such action does not reflect Orahood's best and sincere efforts to minimize her wage loss. Therefore, her job search prior to accepting the position at Jo-Ann Fabrics was inadequate and did not meet the requirements to obtain wage loss benefits. * * *
(Relator's brief at 12.)
 {¶ 51} Apparently, the commission and its deputy did not draw Acusport's conclusion from reading the case manager reports.
 {¶ 52} Viewing the case manager reports in their totality, there is clearly evidence upon which the commission could draw a conclusion very different than the one Acusport draws here. Interestingly, the case manager report authored in late May 2002 (first report) and the one authored in late July or early August 2002 (second report), present a laudatory tone that contrasts sharply with the August 24, 2002 closure report. For example, the first report states that claimant "contacts this case manager on a daily basis to provide updates on her activities and to assist with structuring her job search." The second report presents more laudatory remarks. The report discusses some of the interviews claimant had, noting that the labor market in her area is poor. Significantly, the second report notes that claimant was called for a second interview with Wal-Mart. Unfortunately, Wal-Mart wanted to offer her a part-time position that would not give her consistent hours so that she could secure another part-time job. Consequently, claimant told Wal-Mart that she would take the position only if it were full time.
 {¶ 53} The second case manager report also notes that claimant has mailed out resumes to potential employers, but has not received responses. The report states that claimant has expanded her search to surrounding areas but this is difficult for her due to a transportation problem. The report notes that claimant has talked to her parents about getting another car and searching for jobs in the Columbus area.
 {¶ 54} While the August 24, 2002 closure report does present negative remarks about claimant's job search efforts, it is not entirely negative. The report mentions the Wal-Mart offer again and also notes that claimant "has continued to maintain contact although the plan ended."
 {¶ 55} While the magistrate here takes some effort to discuss the three case manager reports in some detail in response to Acusport's claim in this action, the commission deputy's reference to the report is brief. The deputy wrote:
* * * The injured worker then entered a vocational job search program resulting in limited success due to several problems, both unrelated and related to this claim (transportation difficulties, other medical conditions, lack of available employers in her area, frustration with overall situation, etc.). On 08/24/2002, the injured worker's rehabilitation file was closed due to a lack of a sufficient number of job contacts per week. * * *
 {¶ 56} It is clear from the deputy's order that the case manager reports were reviewed and considered. However, the deputy was not required to adopt Acusport's view of those reports or to conclude, as Acusport does here, that claimant failed to make a good-faith job search prior to obtaining employment at Jo-Ann Fabrics.
 {¶ 57} Apparently, claimant did have an attendance problem during her short-lived employment at Jo-Ann Fabrics and she was fired for that reason. It was claimant's position at the hearing that her attendance problem was the result of her lack of reliable transportation but the problem was finally resolved through the help of her parents in providing her with another car. Apparently, the transportation problem had been successfully corrected by the time claimant began employment at Wal-Mart because the record indicates that claimant worked full time and some overtime at Wal-Mart without an attendance problem. Contrary to Acusport's suggestion here, the commission was not required to view claimant's attendance issue at Jo-Ann Fabrics as a bar to wage loss compensation either at Jo-Ann Fabrics or Wal-Mart. Moreover, Ohio Adm. Code 4125-1-01(D)(1)(c)(xi) permits the commission to take such transportation problems into account in determining the claimant's good-faith effort:
The claimant's economic status as it impacts on his or her ability to search for employment including, but not limited to, such things as access to public and private transportation and telephone service and other means of communications[.]
 {¶ 58} The second issue with respect to the employment at Jo-Ann Fabrics is whether the commission deputy erred in ordering wage loss compensation "subject to extrapolation." According to Acusport, because the commission deputy agreed with Acusport's position that claimant was required to seek additional employment while employed part-time at Jo-Ann Fabrics, it was error to award any wage loss compensation for the period of employment at Jo-Ann Fabrics. The magistrate disagrees.
 {¶ 59} Ohio Adm. Code 4125-1-01(F)(3)(b) permits the commission to award wage loss compensation even when the claimant has voluntarily limited the number of hours she is working. While the term "extrapolation" does not appear in that rule nor anywhere else at Ohio Adm. Code 4125-1-01, the magistrate, nevertheless, finds that the commission's deputy was referring to the wage loss computation provided by Ohio Adm. Code4125-1-01(F)(3)(b).
 {¶ 60} A claimant's average weekly wage is ordinarily used in the calculation of wage loss. Ohio Adm. Code 4125-1-01(F)(1). However, the wage loss based solely on the limited number of hours worked at Jo-Ann Fabrics cannot be fairly calculated using the average weekly wage. Under the wage loss award, claimant will, in effect, receive sixty-six and two-thirds percent of the difference between the hours she worked at Jo-Ann Fabrics at $6 per hour and the $9.55 per hour she made at Acusport.
 {¶ 61} Given the above clarification of the award of wage loss compensation for the part-time employment at Jo-Ann Fabrics, the magistrate finds no abuse of discretion or error in the commission's order.
 {¶ 62} As previously noted, with respect to the Wal-Mart employment, the issue is whether the claimant was required to search for comparably paying work when she began her employment there.
 {¶ 63} As Acusport correctly points out, a return to full-time employment does not automatically eliminate the claimant's duty to search for suitable employment which is comparably paying work. State ex rel. Yates v. AbbottLaboratories Inc., 95 Ohio St.3d 142, 2002-Ohio-2003. InYates, the full-time clerical employment obtained by the claimant grossly underutilized her college degree and real estate license. Her under-employment was pivotal in determining that claimant was required to maintain — despite her full-time job — an ongoing search for something more in keeping with her talents and earning capability. State ex rel. Ameen v. Indus. Comm.,100 Ohio St.3d 161, 163, 2003-Ohio-5362 (summarizing the Yates
holding).
 {¶ 64} While the Yates case presents a scenario in which full-time employment did not excuse the claimant from continuing a search for better paying work, State ex rel. Brinkman v.Indus. Comm. (1999), 87 Ohio St.3d 171, presents the legal principles applicable here. Mr. Brinkman was a Columbus police officer who sustained multiple injuries in a work-related car accident. Examining doctors agreed that Mr. Brinkman could not return to his former job, and disability retirement was granted. Following his retirement, Mr. Brinkman eventually found part-time employment paying $20 per hour at Anheuser-Busch, Inc. ("Busch"). Busch told Mr. Brinkman that part-time workers were given preference for full-time positions as they became available. Mr. Brinkman applied for wage loss compensation which the commission denied. The Brinkman court granted a writ of mandamus explaining:
The commission also characterized claimant's perceived income limitation as voluntary because claimant did not continue to look for full-time work after getting the job at Busch. We have never specifically addressed the question of continuing a full-time job search after acquisition of part-time work. We find particularly appealing Florida's approach to this question due to its judiciary's balance between the normal part-time concerns and economic reality.
In Stahl v. Southeastern X-Ray (Fla.App. 1984),447 So.2d 399, the former employer alleged that claimant's failure to look for a better-paying job after accepting other minimum-wage employment constituted a voluntary income limitation. The court disagreed, writing:
"Whether the acceptance of a particular job with lower earnings amounts to voluntary limitation should be determined based on the enumerated factors [physical impairment, age, industrial history, training and education, motivation, work experience, work record, diligence and availability of jobs] and not based simply on a requirement for continued diligent search by claimant after completion of his normal daily work schedule." Id. at 401.
Rather then focusing simply on income, the Florida court viewed the claimant's employment situation broadly. Within the first three months of work, the claimant received a forty cent per hour raise and was given increased responsibility. When asked why he had stopped looking for other work, claimant responded that "`[m]y boss has indicated that I have a future there, so I feel that I have a good job right now and it would be silly for me to leave a good thing.'" Id. at 402. The court agreed, concluding that "[t]he deputy's order would compel claimant to forfeit any present or future commitment to a full-time job which appears to be appropriate in all ways other than presently diminished earnings." Id.
In this case, the commission is also asking the claimant to" leave a good thing." Stahl is admittedly distinguishable in that post-injury employment was full-time, not part-time, but whether that does or should excuse a broader-based analysis is questionable. Wage-loss compensation is not forever. It ends after two hundred weeks. R.C. 4123.56(B). Thus, when a claimant seeks new post-injury employment, contemplation must extend beyond the short term. The job that a claimant takes may have to support that claimant for the rest of his or her life — long after wage-loss compensation has expired.
Id. at 173-174.
 {¶ 65} In the deputy's order, the deputy describes the Wal-Mart employment as follows:
* * * [W]hile the position initially paid $6.65 per hour, she is currently earning $6.93 per hour and the position includes health insurance, 401(K) participation, profit sharing and vacation/sick leave benefits. * * *
 {¶ 66} Rejecting Acusport's argument that claimant was required to search for comparably paying work while employed at Wal-Mart, the deputy explains:
* * * [W]hile the injured worker is required, pursuant to O.A.C. 4125-1-01(D)(1)(c), to seek to eliminate the wage loss, several factors are enumerated to consider in analyzing whether the injured worker is providing a good faith effort, including: the injured worker's prior experience, the quantity and quality of the contacts, the number of hours spent working, refusal to accept assistance, labor market and economic status conditions, and the injured worker's physical capabilities. Overall, case law has dictated a totality of the circumstances test be applied in these situations. Here, the Deputy finds that the injured worker has satisfied the requirements of the rule as she has little experience (age 23, high school graduate without additional training), has progressed from part-time work without benefits to full-time work with benefits, has already received one pay raise, worked with assistance when available and is living in a small to medium size community.
 {¶ 67} The deputy appropriately determined, viewing the totality of the circumstances, that claimant was under no duty to search for better paying employment while employed at Wal-Mart. The deputy's determination is supported by the Brinkman
decision and particularly by Stahl, the Florida case that theBrinkman court relied upon.
 {¶ 68} Applying the principles set forth in Brinkman,
Acusport's argument, in effect, asks the claimant here to leave a good thing. Wal-Mart consistently offered claimant full-time work, i.e., 80 hours of regular work bi-weekly, overtime work, and often a Sunday premium. While the regular rate of pay started at $6.65 per hour, well under the $9.55 per hour she made at Acusport, claimant's rate of pay was increased to $6.93 within a short period of time. Significantly, Wal-Mart offered an attractive benefits package.
 {¶ 69} Also, at Wal-Mart, claimant earned $9.97 per hour when she worked overtime. There is no indication in the record that claimant had an opportunity to work overtime at Acusport or that a benefits package was provided by Acusport.
 {¶ 70} Under the totality of the circumstances, the deputy could conclude that requiring claimant to search for other work while employed at Wal-Mart was asking the claimant to jeopardize a good thing that was economically in her best interest to keep in the long run. Moreover, contrary to Acusport's suggestion here, that claimant later sought alternative employment while at Wal-Mart does not necessarily alter the conclusion that Wal-Mart had provided to claimant a job that did not require her to seek employment elsewhere.
 {¶ 71} At the February 25, 2003 hearing before the SHO, Acusport submitted copies of classified advertisements from the Bellefontaine Examiner. According to Acusport, higher paying positions were advertised in claimant's local newspaper that accommodated her medical restrictions. Acusport also points to claimant's hearing testimony that she never used the newspaper to search for jobs until several weeks prior to the hearing. Here, Acusport seems to suggest that the classified advertisements compel the conclusion that there existed for claimant comparably paying work that she was required to seek during her Wal-Mart employment.
 {¶ 72} Significantly, Acusport points to no specific classified advertisement that it feels presents an employment opportunity for comparably paying work. Neither the commission nor this court is required to search the listing of advertisements for jobs that might meet Acusport's view of comparably paying work.
 {¶ 73} Moreover, classified advertisements by themselves mean very little in the absence of an expert's analysis of those job advertisements in light of the claimant's medical and vocational limitations. Acusport did not submit a report of a vocational expert analyzing claimant's medical and vocational potential for obtaining comparably paying work. In fact, there is no vocational evidence from an expert that claimant is capable of performing comparably paying work. While Acusport is not required to submit a vocational report in a wage loss claim, its reliance on the classified advertisements fails to present a compelling case that claimant was capable of performing comparably paying work.
 {¶ 74} In short, the commission did not abuse its discretion when it determined that claimant was not required to search for comparably paying work while employed at Wal-Mart.
 {¶ 75} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
 /s/ Kenneth W. Macke
KENNETH W. MacKE, MAGISTRATE